# IN THE SUPREME COURT OF CALIFORNIA

ROBERT E. WHITE,
Plaintiff and Appellant,

v.

SQUARE, INC.,
Defendant and Respondent.

S249248

Ninth Circuit
16-17137

Northern District of California
3:15-cv-04539-JST

August 12, 2019

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

WHITE v. SQUARE, INC.

S249248

Opinion of the Court by Liu, J.

Here we consider a question regarding California's Unruh Civil Rights Act (Civ. Code, § 51 et seq.) (the Act) posed by the United States Court of Appeals for the Ninth Circuit:  Does a plaintiff have standing to bring a claim under the Unruh Civil Rights Act when the plaintiff visits a business's website with the intent of using its services, encounters terms and conditions that allegedly deny the plaintiff full and equal access to its services, and then leaves the website without entering into an agreement with the service provider?  (See *White v. Square, Inc.* (9th Cir. 2018) 891 F.3d 1174, 1175; Cal. Rules of Court, rule 8.548, (a) & (f)(5).)

The answer is yes.  When a plaintiff has visited a business's website with intent to use its services and alleges that the business's terms and conditions exclude him or her from full and equal access to its services, the plaintiff need not enter into an agreement with the business to establish standing under the Unruh Civil Rights Act.  In general, a person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services.  We conclude that this rule applies to online businesses and that visiting a website with intent to use its services is, for purposes of standing, equivalent to presenting oneself for services at a brick-and-mortar store.  Although mere awareness of a business's discriminatory policy

or practice is not enough for standing under the Act, entering into an agreement with the business is not required. We express no view on White's occupational discrimination claims.

## I.

Bankruptcy attorney Robert White sued Square, Inc. (Square) in October 2015, alleging that Square's seller agreement discriminated against bankruptcy attorneys in violation of the Unruh Civil Rights Act. Square offers an internet service that allows individuals and merchants to " 'accept electronic payments without themselves directly opening up a merchant account with any Visa or MasterCard member bank.' " (*White v. Square, Inc.*, *supra*, 891 F.3d at p. 1175.) Square does not charge its users any fee to register for its services; instead, after a user has registered, Square collects a percentage of every transaction as well as a flat fee for each transaction. Square's terms of service state that when a user creates an account, the user must " 'confirm that you will not accept payments in connection with the following businesses or business activities: . . . (28) bankruptcy attorneys or collection agencies engaged in the collection of debt.' " (*Ibid.*)

White's second amended complaint alleges that he "formed the strong, definite and specific intent" to sign up for and use Square's services. White familiarized himself with Square's seller agreement by reviewing a separate lawsuit filed against Square by a bankruptcy law firm called shierkatz RLLP. He then visited Square's website on multiple occasions and carefully reviewed its terms of service. He proceeded to the page of Square's website that allows a user to register for its services, but he declined to click the button labeled "Continue." Because White intended to use Square's services for his bankruptcy

practice, he believed he could not sign the agreement without committing fraud. In support of this belief, White cites a letter from Square's counsel to shierkatz RLLP in which Square stated that " 'signing up for Square's service with the intent to violate the applicable terms of service would be fraudulent.' " (*White, supra*, 891 F.3d at p. 1176, fn. 3.)

The district court dismissed White's second amended complaint with prejudice on the ground that he lacked standing under the Unruh Civil Rights Act to sue Square. The district court concluded that White had not attempted to use Square's services and only had "mere awareness" of its discriminatory terms of service. White appealed to the United States Court of Appeals for the Ninth Circuit, which then issued the certification order at issue here. In the order, the Ninth Circuit concluded that White's allegations "satisfy Article III's requirements for a concrete and particularized injury" and that he has met federal constitutional standing requirements. (*White, supra*, 891 F.3d at p. 1177.)

## II.

Standing rules for statutes must be viewed in light of the intent of the Legislature and the purpose of the enactment. (*Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377, 1385; *Librers v. Black* (2005) 129 Cal.App.4th 114, 124.) The Unruh Civil Rights Act provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or

services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b); all undesignated statutory references are to this code.) Section 52, subdivision (a) provides: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 . . . ." And section 52, subdivision (c)(3) authorizes "any person aggrieved by" conduct of resistance to the full enjoyment of any of the rights described in this section to request "preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order . . . as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."

The purpose of the Act is to create and preserve "a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating' arbitrary, invidious discrimination by such establishments." (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167 (*Angelucci*), citing *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 75–76.) "The Act stands as a bulwark protecting each person's inherent right to 'full and equal' access to 'all business establishments.' (§ 51, subd. (b); see *Isbister*, *supra*, 40 Cal.3d at p. 75.)" (*Angelucci*, at p. 167.) In enforcing the Act, courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses. (*Ibid*.; see

*Isbister*, at p. 75.) We have consistently held that "the Act must be construed liberally in order to carry out its purpose." (*Angelucci*, at p. 167; see *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 (*Koire*).)

In light of its broad preventive and remedial purposes, courts have recognized that "[s]tanding under the Unruh Civil Rights Act is broad." (*Osborne v. Yasmeh* (2016) 1 Cal.App.5th 1118, 1127 (*Osborne*).) At the same time, we have acknowledged that " 'a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct.' " (*Angelucci, supra*, 41 Cal.4th at p. 175.) "In essence, an individual plaintiff has standing under the Act if he or she has been the victim of the defendant's discriminatory act." (*Ibid.* ["plaintiff must be able to allege injury — that is, some 'invasion of the plaintiff's legally protected interests' "].)

## III.

Our cases addressing related issues under the Unruh Civil Rights Act have involved brick-and-mortar establishments, not online businesses, and those cases make clear that a plaintiff who has transacted with a defendant and who has been subject to discrimination has standing under the Act. (See, e.g., *Angelucci, supra*, 41 Cal.4th at pp. 175–176.) The question here is whether standing under the Act extends to a plaintiff who intends to transact, but has not yet transacted, with an online business.

In *Koire*, a male plaintiff visited several "car washes on 'Ladies' Day' and asked to be charged the same discount prices as were offered to females. These businesses refused his request." (*Koire, supra*, 40 Cal.3d at p. 27, fn. omitted.) Also, in response to a radio advertisement by a nightclub offering free

admission to " 'girls' aged 18 to 21," the plaintiff "went to [the nightclub] and requested free admission which was refused." (*Ibid.*) The plaintiff filed suit under the Unruh Civil Rights Act, and the defendants argued that the Act, while prohibiting discriminatory exclusion of patrons from business establishments, does not extend to price discrimination. We held that "[t]he Act's proscription is broad enough to include within its scope discrimination in the form of sex-based price discounts." (*Koire*, at p. 30.) There was no clear indication that the plaintiff, beyond requesting the price discounts, had actually paid a discriminatory price, and in any event, our opinion did not say such payment was required for standing.

In *Angelucci*, four men sued a private club under the Unruh Civil Rights Act for charging them higher admission fees than it charged to women. (*Angelucci*, *supra*, 41 Cal.4th at pp. 164–165.) The plaintiffs had "patronized the club on several occasions" and had paid higher fees based on their gender. (*Id.* at p. 165.) The club sought dismissal on the ground that the plaintiffs "had not alleged they had asked the club to be charged at the same rate as female patrons." (*Ibid.*) We held that nothing in the text of the Act requires that "before a legal action may be filed, the victim of the asserted discrimination must have demanded equal treatment and have been refused." (*Angelucci*, at p. 168.) Such a requirement "would be inconsistent with the purpose of the Act to 'eradicate' or 'eliminate' arbitrary, invidious discrimination in places of public accommodation. . . . If businesses are held not to violate the Act or inflict injury unless they are challenged by a patron, their ordinary practice may revert to discrimination, with special exceptions being made for individuals who happen to challenge the practice." (*Id.* at p. 169.) We declined to read the Act in a

manner that would leave businesses free to discriminate "so long as these establishments agree to provide equal treatment to those customers knowledgeable and assertive enough to demand it." (*Angelucci*, at p. 169.) We also observed that the Act must be understood to afford redress to "persons discriminated against on an occasion when there was no one present to receive and answer a demand for equal treatment (for example, persons encountering, as they did in past decades, racially segregated drinking fountains or restroom facilities at an unattended structure)." (*Angelucci*, at p. 170.) The plaintiffs had standing, we concluded, because each of them "was subjected to, and paid, defendant's gender-based price differential." (*Id.* at pp. 175–176; see *id.* at p. 170 ["each plaintiff presented himself for admittance, paid the price of admission, and entered the establishment"].)

Thus, *Koire* involved a plaintiff who presented himself for admittance and requested equal treatment (without paying the discriminatory price), and *Angelucci* involved plaintiffs who presented themselves for admittance and paid the discriminatory price (without requesting equal treatment). *Angelucci* confirmed that the facts in both contexts were sufficient for standing under the Unruh Civil Rights Act. (*Angelucci, supra,* 41 Cal.4th at pp. 168–170, 173–175.) As noted, we further acknowledged that " 'a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct.' " (*Id.* at p. 175.) Beyond that, our opinion in *Angelucci* expressed no view on the irreducible minimum required for standing.

The case before us involves a plaintiff who neither paid a fee nor requested equal treatment before leaving the business establishment — in this case, a website, not a brick-and-mortar

vendor. White contends that his interaction with Square is analogous to a plaintiff who intends to patronize a brick-and-mortar shop but, upon his attempted entry, sees a sign indicating that the business does not offer services to individuals based on a protected category of which he is a member. According to White, websites and apps on mobile devices are akin to "shopping malls" or other physical storefronts, and that visiting a website with the intention to use its services is equivalent to visiting a brick-and-mortar store with the same intention. Square, by contrast, contends that White is a plaintiff with "mere knowledge" of a business's allegedly discriminatory practice and is no different than any person who hears of discriminatory practices from a news article or through word of mouth.

In resolving this issue, we begin by observing that when a person visits a business's website and encounters a discriminatory provision in the business's terms of service, that person has experienced an interaction distinct from merely learning about a business's discriminatory policy or practices secondhand. White does not allege that he merely heard or read about Square's discriminatory policy; he makes specific allegations detailing his repeated visits to Square's webpage and his examination of its terms and conditions of service. Thus, although we agree with Square that mere awareness of a business's discriminatory policy or practices is not enough for standing, White has alleged more than mere awareness here.

In addition, White alleges that he visited Square's website and reviewed its terms of service with the specific intention to sign up for Square's services and to use them in his bankruptcy law practice. *Angelucci* does not squarely address whether this is sufficient to establish standing, but our reasoning is

suggestive. We made clear that standing under the Unruh Civil Rights Act extends to "persons encountering, as they did in past decades, racially segregated drinking fountains or restroom facilities at an unattended structure" — occasions "when there was no one present to receive and answer a demand for equal treatment." (*Angelucci*, *supra*, 41 Cal.4th at p. 170.) The Act does not require a black plaintiff in that situation to make use of the blacks-only facility (or make use of the whites-only facility in violation of the segregation policy) in order to have standing. It is sufficient for a plaintiff to "encounter[]" (*Angelucci*, at p. 170) an unattended facility with the intent to use it. There is no doubt that such a plaintiff, even if he or she departed without using the facility, could properly claim he or she was "denied [equal] rights" and was "aggrieved by the [discriminatory] conduct." (§ 52, subd. (a), (c).)

The same rule would apply in the case of a person who visited and intended to patronize an unattended establishment generally open to the public (e.g., a self-serve kiosk) but then encountered a sign prohibiting access on the basis of the person's membership in a protected category. In such circumstances, the person would not need to violate or attempt to violate the stated exclusionary policy before bringing a claim. The high court, adopting a similar rule under title VII of the Civil Rights Act of 1964, explained: "If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions

of submitting an application." (*Teamsters v. United States* (1977) 431 U.S. 324, 365–366.)

Square notes that *Angelucci* said "*Koire* determined that injury occurs when the discriminatory policy is *applied* to the plaintiff — that is, at the time the plaintiff patronizes the business establishment, tendering the nondiscounted price of admission." (*Angelucci, supra*, 41 Cal.4th at p. 175.) In addition, Square relies on *Surrey v. TrueBeginnings, LLC* (2008) 168 Cal.App.4th 414 (*Surrey*), which appears to be the only appellate case to examine Unruh Civil Rights Act standing in the context of an online business. *Surrey* involved a matchmaking website that "offer[ed] certain free services to women who joined." (*Id.* at p. 417.) The plaintiff, Steven Surrey, "visited TrueBeginnings's Web site with the intent of utilizing its services; after discovering the discrepancy in its charges, he did not, however, subscribe to or pay for its services." (*Ibid.*) The Court of Appeal held that the plaintiff lacked standing to claim gender discrimination under the Act: "Because he did not attempt to or actually subscribe to TrueBeginnings's services, Surrey did not suffer discrimination in any sense other than 'in the abstract.'" (*Surrey*, at p. 420.) "The mere fact that Surrey became aware TrueBeginnings was offering a discount policy for women subscribers at the time he accessed its Web site did not constitute a denial of his antidiscrimination rights under those statutes. Since Surrey did not attempt to subscribe to TrueBeginnings's services, his interest in preventing discrimination is arguably no greater than the interest of the public at large." (*Id.* at pp. 418–419.) According to Square, just as a plaintiff must "tender the purchase price" in order to challenge discriminatory pricing (*id.* at p. 416), a plaintiff must show "he patronized the defendant's business by subscribing to,

or signing up for, its service, or by engaging in some other transaction making the [terms of service] applicable to him" in order to challenge discriminatory exclusion.

The Court of Appeal in *Osborne* declined to follow *Surrey*'s "bright-line rule" that " 'a person must tender the purchase price for a business's services or products in order to have standing to sue it for alleged discriminatory practices relating thereto.' " (*Osborne, supra,* 1 Cal.App.5th at p. 1133, quoting *Surrey, supra,* 168 Cal.App.4th at p. 416.) In *Osborne,* plaintiff John Flowers alleged he visited the defendants' hotel and was refused a room because he was a disabled person who used a licensed service dog. (*Osborne,* at p. 1123.) According to his complaint, the defendants insisted that he pay a $300 cleaning fee on top of the regular room fee of $80 charged to the general public. (*Ibid.*) Flowers did not pay or offer to pay the fee, and he sued under the Unruh Civil Rights Act. The Court of Appeal, upon reviewing the case law, concluded that "[t]he application of section 51 has not historically turned on whether a plaintiff has paid a fee, or, as *Surrey* stated, 'tender[ed] the purchase price for a business's services or products.' " (*Osborne,* at p. 1128.) Instead, *Osborne* explained, "[w]hen a person presents himself or herself to a business establishment, and is personally discriminated against based on one of the characteristics articulated in section 51, he or she has suffered a discriminatory act and therefore has standing under the Unruh Civil Rights Act. . . . [¶] . . . The cases discussing discrimination under sections 51 and 52 do not focus on whether patrons who were personally discriminated against have alleged or proved that they paid a fee or were subject to unfair pricing before bringing a lawsuit. Indeed, much of the legal history surrounding sections 51 and 52 involve plaintiffs who — like

Flowers and his family — were refused services, thereby making a purchase impossible. To hold that plaintiffs here lacked standing would contradict both the language and the intent of the Unruh Civil Rights Act." (*Id.* at pp. 1133–1134.)

We believe *Osborne* states the better view. As noted, our opinion in *Koire* contained no indication that the plaintiff had tendered payment for the discriminatory prices of which he complained. (See *Osborne, supra,* 1 Cal.App.5th at p. 1132 [discussing *Koire*].) And *Angelucci* recognized that a plaintiff "encountering" unattended segregated facilities would have standing to sue; the plaintiff need not have made a request for equal treatment or actually used the facilities. (*Angelucci, supra,* 41 Cal.4th at p. 170.) Like the plaintiff Flowers in *Osborne*, White visited a business establishment with the intent to use its services. The *Osborne* court required no further step of entering into a transaction with the business, and none is required here as well.

Square contends that because its restriction "applies not to people, but to *transactions*," White "could subscribe, become a patron, and stop short of undertaking the transactions specifically prohibited by the Seller Agreement. This is not a case, then, where the allegedly discriminatory conduct actually barred the plaintiff from signing up." But according to White's complaint, he believed that signing up for Square's services with the intention of using it in his bankruptcy practice would have resulted in "discriminatory termination" by Square and would have caused him additional injury resulting from damage to his "professional reputation and commercial credit." The letter from Square's counsel to shierkatz RLLP that White cites also indicated that subscription to Square's services under these conditions "would be fraudulent." It is not clear how White could

12

have subscribed to Square's services in the circumstances here. In essence, what White alleges is that because of the discriminatory policy stated in Square's terms of service, he was "refused services, thereby making a [subscription] impossible." (*Osborne*, *supra*, 1 Cal.App.5th at p. 1134.)

Nor do we find persuasive Square's argument that because White did not sign up, he was not actually subject to Square's terms of service and therefore suffered no actual or personal injury from any alleged discrimination. This contention takes too narrow a view of the harms that the Unruh Civil Rights Act is intended to deter and remedy. White elucidates this point with the following hypothetical: "Suppose an African-American person approaches a brick-and-mortar furniture store, intending to buy a bed, and sees a sign in the window that says, 'We sell on credit. (Black people must pay cash.)' The person declines to enter the store. Does that person have standing? Yes . . . . And if this person instead goes to the store's website with exactly the same intent, faces exactly the same restriction, and declines to agree to the discriminatory term . . . , there is no reason why the result should differ. Square would require this plaintiff to enter the bricks-and-mortar store, enter into a contractual relationship with the owner, and then endure the further humiliation of denial of credit — or to sign up on the defendant's website and face the same rebuff when she later asks for credit. Neither the deterrent nor the compensatory purposes of the Unruh Act would be served by such requirements. Indeed, both would be undermined."

Square further contends that if a plaintiff has not signed up for its services, then in order to have standing "the plaintiff must show that the defendant applied its discriminatory policy on a particular occasion to prevent him personally from

becoming a patron in the first place." But an individual who intends to take a drink at a shopping mall and leaves upon encountering unattended segregated fountains, like the customer who walks away from the furniture store in White's hypothetical above, has personally experienced the application of a discriminatory policy. Similarly here, White alleges he was effectively refused service by Square upon visiting its website with the intent of subscribing and then encountering its allegedly discriminatory terms of service. Our reasoning in *Angelucci* makes clear that in order to have standing, White did not need to contact Square to ask for an exception to the stated restriction or to verify that the restriction applied to him. (*Angelucci, supra*, 41 Cal.4th at p. 170.) Such a requirement would limit a business's liability only to individuals who inquire and would potentially enable a business to make exceptions to its stated policies in order to avoid suit, even as its stated policies deter the lion's share of customers belonging to a protected group.

Finally, Square argues that allowing White to proceed would "radically expand the universe of 'aggrieved' persons" and lead to class actions that include "lead plaintiffs and absent class members who did not actually suffer any personal denial of equal rights." In *Angelucci*, we rejected a similar argument concerning abusive litigation, boundless statutory damages, and extortionate settlements. (*Angelucci, supra*, 41 Cal.4th at p. 178.) While sharing these concerns "to some degree," we said they "do not supply a justification for our inserting additional elements of proof into the cause of action defined by the statute. It is for the Legislature (or the People through the initiative process) to determine whether to alter the statutory elements of proof to afford business establishments protection against

abusive private legal actions and settlement tactics.  It is for the Legislature, too, to consider whether limitations on the current statutory private cause of action might unduly weaken enforcement of the Act or place unwarranted barriers in the way of those persons who suffer discrimination and whose interests were intended to be served by the Act." (*Id.* at p. 179.)  We also discussed equitable defenses and constitutional limitations on statutory penalties as important safeguards.  (*Id.* at pp. 179–180.)

Under the rule proposed here, an individual bringing an Unruh Civil Rights Act claim against an online business must allege, for purposes of standing, that he or she visited the business's website, encountered discriminatory terms, and intended to make use of the business's services.  These requirements are sufficient to limit standing under the Unruh Civil Rights Act to persons with a concrete and actual interest that is not merely hypothetical or conjectural.  Square's alternative rule, which in this case may have required White to risk committing fraud before being able to bring a claim, would not adequately serve the Act's broad purpose of eradicating discriminatory business practices.

In concluding that White has sufficiently alleged injury for Unruh Civil Rights Act standing, our opinion does not preclude Square from disputing White's factual allegations.  Square may argue in a motion for summary judgment or at trial that White did not actually possess a bona fide intent to sign up for or use its services.  Our standing analysis is limited to the pleadings, in which White unequivocally alleges his intention to use Square's services.  Nor do we express any view on whether a defendant violates the Act by discriminating on the basis of occupation or on White's adequacy as a representative for a class

of bankruptcy attorneys excluded from Square's services. The question of an individual plaintiff's standing under the Unruh Civil Rights Act is distinct from the question of that plaintiff's ability to serve as a representative for a class of allegedly aggrieved individuals. (See *Angelucci*, *supra*, 41 Cal.4th at pp. 170–171; *Weaver v. Pasadena Tournament of Roses* (1948) 32 Cal.2d 833, 839 [finding no actionable representative suit where the plaintiff sought to represent all persons who stood in line for tickets but could not buy one because the question as to each individual plaintiff was whether he or she presented himself or herself as a " 'sober, moral person' " and sought admittance to the game].)

## CONCLUSION

We conclude that a person who visits a business's website with intent to use its services and encounters terms or conditions that exclude the person from full and equal access to its services has standing under the Unruh Civil Rights Act, with no further requirement that the person enter into an agreement or transaction with the business. We disapprove *Surrey v. TrueBeginnings, LLC*, *supra*, 168 Cal.App.4th 414, to the extent it is inconsistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** White v. Square, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S249248
**Date Filed:** August12, 2019

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Moskovitz Appellate Team, Myron Moskovitz, Christopher Hu; McGrane, William McGrane; Reallaw and Michael J. Hassen for Plaintiff and Appellant.

John C. Colwell for National Association of Consumer Bankruptcy Attorneys as Amicus Curiae on behalf of Plaintiff and Appellant.

Melissa Riess; Linda Kilb; Lindsay Nako and Daniel Nesbit for Disability Rights Advocates, Disability Rights Education & Defense Fund, Impact Fund, Civil Rights Education and Enforcement Center, Disability Rights California, Disability Rights Legal Center, Law Foundation of Silicon Valley, Legal Aid at Work, Legal Services for Prisoners with Children, National Federation of the Blind, National Federation of the Blind of California and Public Justice as Amici Curiae on behalf of Plaintiff and Appellant.

Munger, Tolles & Olson, Fred A. Rowley, Jr., Jeffrey Y. Wu, Jonathan H. Blavin, J. Max Rosen; Wilson Sonsini Goodrich & Rosati, Colleen Bal and Joshua A. Baskin for Defendant and Respondent.

Quinn Emanuel Urquhart & Sullivan, Kathleen M. Sullivan, Diane M. Doolittle and Brett J. Arnold for Internet Association as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Myron Moskovitz
Moskovitz Appellate Team
90 Crocker Avenue
Oakland, CA  94611
(510) 384-0354

Fred A. Rowley, Jr.,
Munger, Tolles & Olson
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071-3426
(213) 683-9100